CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 26, 2026

LAURA A. AUSTIN, CLERK
BY:  s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Glenn Walker | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Anja Walker, | ) | Civil Action No. 5:25-cv-00052 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Moises Hernandez Sanchez, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case arises out of the sale of a home in Winchester, Virginia, that allegedly suffered from several concealed defects. Plaintiffs Glenn and Anja Walker ("the Walkers") filed suit against the seller, Defendant Moises Hernandez Sanchez; the listing agent and her brokerage, Defendants Janet Pichon Cersley and New Millennium RE, LLC ("New Millennium"); the selling agent and her brokerage, Defendants Elizabeth Jane Yesford and E Venture, LLC ("E Venture"); and the home inspector, Defendant Marlon Moore.

This matter is before the court on motions to dismiss filed by Sanchez, (Dkt. 7); Cersley and New Millennium, (Dkt. 16); Yesford, (Dkts. 10, 11); and E Venture, (Dkts. 20, 21). For the reasons that follow, the court will grant in part and deny in part Sanchez's motion to dismiss; grant Cersley and New Millennium's motion to dismiss; grant in part and deny in part Yesford's motion to dismiss; and grant in part and deny in part E Venture's motion to dismiss.

## I.    Background

### A.  Factual History

The following facts are taken from the Walkers' complaint and, at this stage, are accepted as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Sometime near September 21, 2022, Sanchez acquired residential real property at 104 Inca Trail, Winchester, Virginia ("the Property").  (Compl. ¶ 11.)  Sanchez received a contractor license from the Maryland Home Improvement Commission but has never possessed a contractor or tradesman license from the Virginia Board for Contractors.  (*Id.*)

Sometime before May 2023, Sanchez undertook sweeping renovations to the Property.  (*Id.* ¶ 12.)  Among other alterations, Sanchez demolished walls, support posts, and beams; modified various "structural components"; constructed new decks and stairs; installed new flooring, roofing, and siding; and set up a new water heater.  (*Id.*)  Sanchez neither sought nor obtained the building permits as required by law.  (*Id.* ¶ 14.)  The Walkers allege, on "reasonable suspicion and belief," that much of this work was carried out by unlicensed and inexperienced individuals.  (*Id.*)

According to the Walkers, Sanchez knew that removing load-bearing walls and beams "would alter the structural components and integrity of the Property."  (*Id.* ¶ 13.)  They allege that Sanchez concealed the alterations through drywall, tape, sealant, paint, and new flooring.  (*Id.*)  The result, the Walkers contend, was that no prospective buyer could have detected the removal of these structural elements.  (*Id.*)

On or about April 26, 2023, Sanchez engaged Defendant Janet Pichon Cersley to market the property for sale, with Defendant New Millennium serving as the listing office.

(*Id.* ¶ 16.)  From April 2023 to July 18, 2023, Cersley "was affiliated with" New Millennium, which shared "commissions with Cersley for her sales," and "had the power to dismiss her" and to "dictate the means and method of her work."  (*Id.* ¶ 15.)  According to the Walkers, Cersley knew that Sanchez lacked a Virginia contractor's license, and she further knew that Sanchez hired unlicensed contractors and laborers to perform the work.  (*Id.* ¶ 16.)

On or about May 29, 2023, Plaintiff Anja Walker communicated with Cersley, indicating her interest in the Property.  (*Id.* ¶ 17.)  Cersley recommended that the Walkers retain a separate agent and directed them to Defendant Elizabeth Jane Yesford.  (*Id.*)  At the time, Yesford was the principal broker of Defendant E Venture, LLC.  (*Id.* ¶ 18.)  Cersley did not disclose to the Walkers that, at that time, she was in discussions with Yesford to transfer Cersley's license to E Venture, (*id.* ¶ 19), a move she ultimately completed in July 2023, (*id.* ¶ 53).  The Walkers allege that had they known of this relationship, they would have either selected a different selling agent or declined to pursue the Property entirely.  (*Id.* ¶¶ 19–20.) Yesford did not reveal this information when Anja Walker and Yesford spoke via phone on May 29, 2023.  (*Id.* ¶ 20.)

The Walkers allege that, on May 29, 2023, they entered into an oral brokerage contract with Yesford, wherein she and E Venture agreed to represent the Walkers in their efforts to purchase the Property.  (*Id.* ¶ 137.)  On May 30, 2023, Anja Walker toured the Property with Yesford.  (*Id.* ¶ 22.)  There, Anja Walker stated that the Walkers would not consider buying a property with foundation or structural problems.  (*Id.*)  Because Glenn Walker was in California and wished to view the Property in person, the Walkers agreed to submit an offer

with a 7-day contingency period to allow Glenn Walker to travel to Virginia and walk through the Property.  (*Id.*)

That same day, the Walkers and Sanchez entered into a purchase contract at a sales price of $255,000.00, with settlement scheduled for June 30, 2023.  (*Id.* ¶ 23.)  The contract incorporated several addenda, including a "Home Inspection and Radon Testing Contingency Addendum," a "Conventional Financing and Appraisal Contingency Addendum," and a "Private Well and/or Septic Contingency Addendum."  (*Id.*)

The Home Inspection Contingency provided that the purchase contract was contingent on a home inspection by a licensed and insured inspector.  (Dkt. 1-2 at 17.)  Under the Home Inspection Contingency, the Walkers could send Sanchez an inspection addendum "listing the specific existing deficiencies of Property that [the Walkers] would like [Sanchez] to remedy together with [the Walkers'] proposed remedies."  (*Id.*)  If the parties could not agree on the terms of the inspection addendum within a specified negotiating period, the Walkers would have two days to void the contract.  (*Id.*)  Otherwise, the home inspection contingency would fall away, and the contract would proceed.  (*Id.*)

The following day, Yesford told Anja Walker that she had arranged for a home inspection for June 4, 2023. (Compl. ¶ 24.)  Yesford introduced Anja Walker to Defendant Marlon Moore via email on June 1.  (*Id.*)  Moore was the only inspector whom Yesford recommended.  (*Id.*)  Unbeknownst to the Walkers, Moore's home inspector license expired more than a year earlier.  (*Id.* ¶ 25.)  Yesford did not verify Moore's licensure status before she asked him to perform the inspection, and Moore never informed the Walkers that he was

unlicensed and uninsured.  (*Id.*)  The Walkers would not have permitted Moore to inspect the Property had they been aware of these facts.  (*Id.*)

Moore conducted his inspection of the Property on June 4, 2023.  (*Id.* ¶ 27.)  During or shortly following the inspection, Moore relayed to Yesford that the columns beneath the deck were "sistered"—an indicator of structural weakness—and recommended that the Walkers engage a contractor to evaluate the deck and perform a structural inspection.  (*Id.*)  Yesford did not relay this recommendation to the Walkers.  (*Id.*)  Instead, she texted Anja Walker that the inspection had been completed and described the findings as: "Overall good some minor things."  (*Id.*)

Moore's written report, emailed to the Walkers later that day, noted the sistered column but did not characterize it as a sign of weakness.  (*Id.* ¶ 28.)  Rather than recommending a structural inspection to the Walkers as he verbally did to Yesford, Moore suggested only that the Walkers "consult[] seller for additional information."  (*Id.* ¶ 28 (citing Dkt. 1-3 at 6).)  The report also listed Moore's license number without disclosing that it had expired.  (*Id.*)  Because of these actions, the Walkers allege they had no basis for believing that the Property had severe structural issues.  (*Id.*)

That evening, Yesford prepared and sent to the Walkers a draft Inspection Contingency Removal Addendum ("HICRA").  (*Id.* ¶ 29.)  This document listed the deficiencies in the Property that Sanchez was expected to repair as a condition of moving forward with the sale.  (*See generally* Dkt. 1-4.)  As the proposed remedy for the sistered wood supports, Yesford's draft HICRA stated: "Suggest consulting seller for additional information."  (*Id.* at 2.)  Yesford inserted this language because she had recently learned Sanchez was a contractor and

presumed he would know how to address the deficiency. (*Id.* ¶ 32.)  Yesford never shared that assumption—nor that Sanchez would serve as the contractor to recommend or make the repairs—with the Walkers. (*Id.*)  The Walkers signed the HICRA, "[r]elying on the material facts concealed by Yesford." (*Id.*)

On June 5, 2023, Yesford forwarded the signed HICRA to Cersley. (*Id.* ¶ 33.)  Under the Home Inspection Addendum's terms, the parties had a negotiation period of three days after June 5, 2023, in which they could "negotiate a mutually acceptable" HICRA that addressed any deficiencies found in the home inspection. (Dkt. 1-2 at 17.)  If the parties did not reach an agreement by June 8, 2023, the Walkers had two days in which they could void the residential sales contract. (*Id.*)

On June 9, 2023, Anja Walker asked Yesford whether Sanchez was addressing the HICRA items. (Compl. ¶ 37.)  Yesford told the Walkers that Sanchez was making the corrections, even though she had not yet received a countersigned HICRA from Sanchez. (*Id.*)  She did not advise the Walkers that the negotiation window under the Home Inspection Addendum had already lapsed and that only one day remained to either void the contract or proceed without the inspection contingency. (*Id.*)

Sanchez did not countersign the HICRA until June 16, 2023, at which point he agreed to repair all listed items except a window crack. (*Id.* ¶ 38.)  Under the HICRA, Sanchez agreed to perform the repairs with a licensed contractor and to provide receipts for the repairs. (*Id.*)  The Walkers allege, however, that Sanchez signed with no intention of using Virginia-licensed contractors. (*Id.*)  Further, the Walkers allege that Cersley knew that Sanchez had no intention

of using a contractor licensed to do the work required and knew that he intended to pay those workers in cash. (*Id.*)

The residential sales contract included a Septic Addendum, which required Sanchez to arrange for a water potability test and septic inspection. (*Id.* ¶ 34; *see also* Dkt. 1-2 at 30.) Meanwhile, the Walkers were required to get a well inspection by June 14, 2023. (Compl. ¶ 34; *see also* Dkt. 1-2 at 30.) If the Walkers obtained unsatisfactory well inspection results, they could void the residential sales contract for the Property. (Compl. ¶ 34.) However, if the Walkers did not act before June 14, 2023, they would lose this well inspection contingency and the residential sales contract would proceed as normal. (*Id.*) Without consulting with the Walkers, Yesford "agreed with Cersley to have one company perform" the well and septic inspections and the water potability test. (*Id.* ¶ 35.) On June 6, 2023, Cersley scheduled an appointment for the inspections with Powell's Plumbing, LLC to be performed on June 22, 2023. (*Id.*) Even though the inspection would now occur after the June 14 deadline, Yesford failed to "protect[] the Walkers' rights under the Contract" by "prepar[ing] an addendum extending the well inspection deadline and related negotiation period." (*Id.* ¶ 36.)

On June 20, 2023, Anja Walker asked Yesford for an update on the outstanding inspections. (*Id.* ¶ 39.) Yesford replied that she had not received the results of the well and septic inspections. (*Id.*) Apparently in the dark that the well and septic inspections had been scheduled for June 22, 2023, Yesford then asked Cersley whether the well and septic inspections had been performed. (*Id.*)

On June 22, 2023, Powell's Plumbing, LLC performed the well and septic inspection, but not a water potability test. (*Id.* ¶ 40.) Powell Plumbing's inspection report stated that the

treatment system did not work properly and was not in compliance with design or operating

parameters. (*Id.*; *see* Dkt. 1-5.) When Anja Walker asked Yesford for an update on the septic

and well inspections on June 23, 2023, Yesford informed her that they would be occurring on

June 26, 2023. (Compl. ¶ 41.) Anja Walker asked for the contact information of Powell's

Plumbing to ensure that the company would not delay the inspections (and thus delay escrow).

(*Id.*) Yesford responded by noting that Sanchez was arranging for the inspections, and that

she would ask Cersley for the requested information. (*Id.*) On June 27, 2023, Yesford received

Powell Plumbing's inspection report and forwarded it to Anja Walker. (*Id.* ¶ 42.) Yesford

stated: "They got an estimate for work 2K It will be scheduled but they cant [sic] get to it for

two weeks We can close but need to hold money in escrow until completed." (*Id.*)

The Walkers allege that Yesford had not verified whether a water potability test had

been performed. (*Id.* ¶ 43.) Nonetheless, Yesford prepared and sent to the Walkers an

"Addendum – Sale," which would hold $5,000 in escrow until Sanchez completed the septic

repairs. (*Id.*) Yesford assured the Walkers that the repairs would be done within two weeks,

even though the repairs were not yet scheduled. (*Id.* ¶ 44.)

On June 28, 2023, Cersley and Yesford—without consulting the Walkers—decided to

use a Seller's Post-Settlement Occupancy Agreement ("Occupancy Agreement") in lieu of the

Addendum – Sale, so that the closing, scheduled for June 30, 2023, would not be delayed. (*Id.*

¶¶ 46–47.) The Occupancy Agreement functioned as a "rent-back" agreement with Sanchez,

wherein Sanchez could remain in the Property for a set period after the settlement date. (*Id.*

¶ 46; *see* Dkt. 1-7 at 1.) The Walkers expressed confusion to Yesford regarding the Occupancy

Agreement's language, but Yesford informed them that the Occupancy Agreement functioned

to hold $5,000 in escrow; once Sanchez provided proof that the repairs were complete, he would receive the funds. (Compl. ¶ 49.) Yesford told the Walkers that they needed to proceed with the Occupancy Agreement, rather than an Addendum – Sale, to avoid an appraisal. (*Id.*) However, the "Other Terms" section of the Occupancy Agreement was left blank by Yesford. (*Id.* ¶ 46; *see* Dkt. 1-7 at 2.)

On June 28, 2023, Sanchez signed an Enhanced Coverage Owner/Seller Affidavit ("Seller Affidavit"), stating that he had "no actual knowledge of any problems relating to either the issuance of a building permit[,] or the failure to obtain one for any improvements [to] the property." (Compl. ¶ 48 (quoting Dkt. 1-8 at 3).) According to the Walkers, Sanchez knew when he signed the Seller Affidavit that "he failed to obtain the required building permits for the renovations he undertook at the Property" and signed the Seller Affidavit to induce the Walkers' title insurance company to issue the Walkers a policy of title insurance, "without which the Walkers would not have closed." (Compl. ¶ 48.)

Before the Property's settlement on June 30, 2023, Yesford ostensibly performed a walk-through of the Property and observed that the HICRA repairs were incomplete. (*Id.* ¶ 50.) Yesford discussed these remaining repairs with Cersley, who told Yesford that Sanchez would complete these repairs by the post-occupancy deadline of July 14, 2023. (*Id.*) Yesford did not inform the Walkers about this walk-through or about her conversation with Cersley. (*Id.*)

On June 30, 2023, the Walkers signed the closing paperwork. (*Id.* ¶ 51.) Thereafter, E Venture and New Millennium received commissions and fees. (*Id.*) The Walkers allege that Yesford did not schedule or perform a final walk-through of the Property during the post-

- 9 -

settlement occupancy period. (*Id.* ¶ 52.) Thereafter, Cersley's real estate license was transferred to E Venture. (*Id.* ¶ 53.)

On July 24, 2023, Glenn Walker requested the key to the Property, as he would be visiting it. (*Id.* ¶ 54.) Yesford responded that Sanchez was still finalizing the septic and well repairs, and that the repairs would now not be scheduled until August 14, 2023. (*Id.*) On July 31, 2023, after arriving at the Property, the Walkers contacted Yesford because the water was not working properly. (*Id.* ¶ 55.) On August 1, 2023, Glenn Walker found a structural crack in the Property's foundation that was not disclosed on Moore's inspection report. (*Id.* ¶ 56.) On August 3, 2023 and August 6, 2023, Frederick County issued several violations for (1) the Property's two decks being built without permits and in violation of code requirements; (2) the removal of structural supports carrying the roof load; (3) the HVAC system being installed without proper permits and inspections; (4) plumbing being installed without permits and inspections; (5) electrical work having been performed without obtaining permits and inspections; and (6) insulation having been installed without the vapor barrier exposed. (*Id.* ¶ 57.)

Soon after, Powell's Plumbing cancelled the septic repairs, well repairs, and water testing scheduled for August 14, 2023, as Sanchez failed to pay the required deposit. (*Id.* ¶ 59.) Sanchez thereafter made one payment on August 16, 2023, and then the final payments on September 14, 2023. (*Id.*) Powell's Plumbing eventually inspected the Property's plumbing and completed the septic and well repairs on August 30, 2023. (*Id.* ¶ 61.) Powell's Plumbing warned the Walkers against drinking the water because the Property lacked an acid neutralizer.

(*Id.*)  The Walkers did not learn that the water was potable until approximately three months after closing.  (*Id.*)

On August 27, 2023, a professional engineer found that the Property lacked proper lateral stability; that Sanchez's modifications "were not in compliance with industry standards and building codes"; and that the exterior decks "were not in compliance with industry standards and building codes."  (*Id.* ¶ 60.)  The Property has remained vacant since.  (*Id.* ¶ 62.)  The Walkers removed the decks and rebuilt one of them to industry standards and building codes.  (*Id.*)  The Walkers could not replace the other deck and fix the deficiencies cited by the County due to the prohibitive expense.  (*Id.*)

## B.  Procedural History

The Walkers filed a 15-count complaint on May 28, 2025.  (*See id.*)  Counts 1, 2, 3, and 4 bring fraud in the inducement, constructive fraud, breach of contract, and Virginia Consumer Protection Act claims against Sanchez.  (*Id.* ¶¶ 63–91.)  Counts 5, 6, 7, 8, and 9 bring fraud in the inducement, constructive fraud, breach of contract, Virginia Consumer Protection Act, and negligence claims against Moore.  (*Id.* ¶¶ 92–122.)  Counts 10, 11 and 12 bring fraud in the inducement, constructive fraud, and breach of contract claims against Yesford and E Venture.  (*Id.* ¶¶ 123–41.)  Counts 13 and 14 bring fraud in the inducement and constructive fraud claims against Cersley and New Millennium.  (*Id.* ¶¶ 142–54.)  Count 15 brings a civil conspiracy claim against all defendants.  (*Id.* ¶¶ 155–61.)  The Walkers allege damages including "the loss in the value of the Property, the costs to stabilize and repair the Property, the cost to hire construction consultants," lost rental income, and the cost of "paying purchase monies under the Contract."  (*Id.* ¶¶ 68, 75, 97, 103, 128, 134, 147, 153, 160.)

Sanchez filed a motion to dismiss on August 27, 2025. (Dkt. 7.) Cersley and New Millennium filed a motion to dismiss on September 19, 2025. (Dkt. 16.) Yesford and E Venture filed motions to dismiss on September 2, 2025, and September 26, 2025, respectively. (Dkts. 10, 11, 20, 21.) Moore was served on August 16, 2025, (Dkt. 4), but he has neither appeared nor otherwise responded to this suit.

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616.

When exercising diversity jurisdiction, federal courts apply the substantive law of the forum state, including choice of law rules. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 226 (1991) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (observing that choice of law rules are substantive). "Tort claims

brought in Virginia are governed by the substantive law of the place of injury." *Frye v. Omni Charlottesville Virginia Corp.*, No. 3:24-cv-00015, 2025 WL 2689025, at *3 (W.D. Va. Sept. 19, 2025) (citing *Frye v. Commonwealth*, 345 S.E.2d 267, 272 (Va. 1986)). "Here, because the alleged tortious conduct and injury stem from a real estate transaction in Virginia, the Court must apply Virginia's common law of fraud." *GGC Assocs., LLC v. Hamner*, No. 3:17-cv-00402, 2018 WL 3735580, at *6 (E.D. Va. Aug. 6, 2018).

### III.   Analysis

#### A. Sanchez

Sanchez offers several arguments in support of his motion to dismiss.[1]   The court addresses each in turn.

##### 1.   Fraud in the Inducement (Count 1)

To state a valid claim for fraud in the inducement under Virginia law, a plaintiff must allege that the defendant (1) falsely represented a material fact (2) for the purpose of procuring the contract, and that the plaintiff (3) relied on that representation and (4) was induced by it to enter the contract.  *See George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 255 S.E.2d 682, 683 (Va. 1979); *Brame v. Guarantee Fin. Co.*, 124 S.E. 477, 481 (Va. 1924).  Fraud in the inducement is "ground for rescission of the contract" as well as ground "for an action for damages." *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010) (quoting *George Robberecht Seafood*, 255 S.E.2d at 683).

The Walkers allege that Sanchez falsely represented—or fraudulently concealed— several material facts.  In particular, the Walkers allege that Sanchez (1) misrepresented that

---

[1] Sanchez does not move to dismiss the Walkers' breach of contract claim (Count 3).  (*See* Dkt. 7 at 1.)

the deck, water heater, and dryer were "new" in the MLS listing; (2) concealed the removal of supporting walls and beams; (3) concealed a horizontal separation between the roof beams and ceiling; (4) misrepresented that he would use a licensed contractor to make the HICRA repairs and he would obtain receipts for HICRA repairs; (5) misrepresented that the HICRA repairs would be complete by June 30, 2023; (6) misrepresented that the HICRA repairs would be complete by July 14, 2023; (7) misrepresented that the well repairs, the septic system repairs, and water test would be complete by July 14, 2023; (8) misrepresented that he had no actual knowledge of problems relating to building permits or the failure to obtain one for his improvements to the Property; and (9) concealed structural problems and damage with new building materials, drywall, sealant, spackle, and paint.  (Compl. ¶ 64.)

Sanchez argues that the Walkers' fraud in the inducement claim against him should be dismissed for several reasons.  The court discusses each in turn.

> i.     *The source-of-duty rule does not bar the Walkers' claims.*

First, Sanchez argues that Virginia's source-of-duty rule bars several of the Walkers' allegations from supporting their fraud claims.[2]  (*See* Dkt. 8 at 4–6.)  Under the source-of-duty rule, "tort liability cannot be imposed upon a contracting party for failing to do a contractual task when no common-law tort duty would have required him to do it anyway."  *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 255 (Va. 2019).  This rule is intended to protect against "turning every breach of contract into a tort."  *Id.*  In other words, when a plaintiff's claim alleges a breach of a duty arising "'by mere agreement of the parties,' as opposed to 'by

---

[2] According to Sanchez, these allegations that should be barred by the source of duty rule are that Sanchez would (i) "use a licensed contractor to make the Inspection Contingency Removal Addendum (HICRA) repairs"; (ii) "obtain receipts"; (iii) would complete HICRA repairs by June 30, 2023 or July 14, 2023; and (iv) would complete well and septic system repairs and complete the water test by July 14, 2023.  (Dkt. 8 at 4.)

operation of law,' then it sounds in contract and the source-of-duty rule prevents recovery in tort for that breach." *Harrell v. DeLuca*, 97 F.4th 180, 190 (4th Cir. 2024) (quoting *Tingler*, 834 S.E.2d at 255).

But the Walkers allege that Sanchez made these promises with a present intention not to perform them. (*See* Compl. ¶¶ 38, 64.) "[T]he Supreme Court of Virginia has recognized that a claim for fraud 'may sometimes be predicated on promises which are made with a present intention not to perform them, or on promises made without any intention to perform them.'" *Ralls v. Fed. Nat'l Mortg. Ass'n*, No. 3:18-cv-00110, 2019 WL 3797358, at *4 (W.D. Va. Aug. 12, 2019) (quoting *Lloyd v. Smith*, 142 S.E. 363, 365 (Va. 1928)). "The basis for the exception is that 'the state of the promisor's mind at the time he makes the promise is a fact,' so that, if he misrepresents his state of mind, 'he misrepresents a then existing fact.'" *Merenstein v. St. Paul Fire & Marine Ins. Co.*, 142 F. App'x 136, 139 (4th Cir. 2005) (quoting *Lloyd*, 142 S.E. at 366).

"[W]here the alleged fraud was perpetrated *before* a contract between the parties came into existence, it cannot logically follow that the duty allegedly breached was one that finds its source in the contract." *DeLeon v. McGaha*, No. 21005669-00, 2022 WL 18777651, at *6 (Va. Cir. Ct. Feb. 1, 2022) (citing *Abi-Najm*, 699 S.E.2d at 490). The Walkers so allege that Sanchez's fraud was perpetrated before he contracted with the Walkers. (Dkt. 12 at 8–9 (citing Compl. ¶¶ 38, 64).) They allege that "Sanchez signed the HICRA with no intention of having the work performed by a contractor licensed in Virginia" and that he had no intention of completing the agreed upon repairs by the contractual deadlines. (Compl. ¶¶ 38, 64.) "Accepting the plaintiff's allegations as true, the court concludes that [Sanchez's] promise

- 15 -

regarding future conduct, which was allegedly made with present fraudulent intent, constitutes a sufficient predicate for the plaintiff's claim of fraud." *Ralls*, 2019 WL 3797358, at *4.

Accordingly, the source-of-duty rule does not bar the Walkers' fraud in the inducement claims against Sanchez based on these allegations.

   *ii. The Walkers have satisfied Rule 9(b).*

Next, Sanchez argues that the remainder of the Walkers' fraud claims fail to satisfy the requirements of Rule 9(b) of the Federal Rule of Civil Procedure. (Dkt. 8 at 6–7.) This rule requires plaintiffs to plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson v. Eagle National Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

Contrary to Sanchez's contention, the Walkers' complaint satisfies Rule 9(b)'s particularity requirements. The Walkers listed exhaustively Sanchez's allegedly false representations or concealments. (Compl. ¶ 64.) And while the Walkers don't allege specific facts showing Sanchez's knowledge of the falsity of his statements, Rule 9(b) permits the Walkers to "*generally* allege that [Sanchez] knowingly and intentionally made these false statements and did so with no intention to perform in accordance with those statements." *Viano v. THD At-Home Servs., Inc.*, No. 1:19-cv-01272, 2020 WL 1815681, at *6 (E.D. Va. Apr. 9, 2020) (emphasis added). Accordingly, the Walkers fraud claim "satisfies Rule 9(b), Fed. R. Civ. P., by making *particular* allegations regarding the fraud's circumstances and *general* allegations regarding defendant's intent and knowledge." *Id.* (emphasis added).

*iii.    The court will not dismiss the Walkers' complaint based on their requested rescission remedy.*

Finally, Sanchez moves to dismiss the Walkers' claims by arguing their sought-after remedy of rescission is inappropriate. (Dkt. 8 at 7.) The Walkers respond that a Rule 12(b)(6) motion cannot be used to dismiss a specific remedy. (Dkt. 12 at 13.) The court agrees with the Walkers. "A Rule 12(b)(6) motion may only be used to dismiss claims, not remedies." *Polito's Christmas Wholesale LLC v. Blue Mountain Christmas Tree Farm*, No. 1:23-cv-00027, 2024 WL 4202729, at *2 (W.D. Va. Sept. 16, 2024). "Therefore, [Sanchez] must contest the requested remedy . . . at a later point in the case." *Id.*

*iv.    Arguments offered for the first time in Sanchez's reply will mostly not be considered.*

Finally, in his reply, Sanchez offers several new arguments for dismissal of the Walkers' claims. (Dkt. 14 at 1–7.) "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 268 (D. Md. 2023) (citation omitted). The court will follow that rule here, as the "opposing party is prejudiced" by being unable to "respond to the argument." *Touchcom, Inc. v. Bereskin & Parr*, 790 F. Supp. 2d 435, 446 (E.D. Va. 2011) (citation omitted).

The court will, however, address one argument: Sanchez's argument that, under the doctrine of *caveat emptor*, he had no duty to disclose any material facts about the Property. (Dkt. 14 at 4–5.) It's true that, under Virginia's *caveat emptor* rule, purchasers are responsible for "discover[ing] defects in the property which a reasonable inspection would have disclosed." *Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998). But there are well-recognized exceptions to this rule. Concealment of material facts can amount to fraud in two situations: first, when a seller makes "a knowing and a deliberate decision not to disclose a material fact," *id.*, and

second, when the seller "say[s] or do[es] anything to throw the purchaser off his guard or to divert him from making the inquiries and examination which a prudent man ought to make," *Armentrout v. French*, 258 S.E.2d 519, 524 (Va. 1979) (quoting *Horner v. Ahern*, 153 S.E.2d 216, 219 (Va. 1967)).

Here, the Walkers' allegations fall, at least, under the second exception. The Walkers allege that Sanchez concealed "a horizontal separation between the roof beams and roof ceiling" and "the removal of existing walls and supporting beams" using drywall, tape, sealant, and new flooring. (Compl. ¶ 13.) According to the Walkers, "[t]hese concealing efforts ensured no one would know that walls or supporting beams had been removed." (*Id.*) These allegations place the Walkers' claims squarely within a recognized exception to the *caveat emptor* doctrine: diversion of the Walkers "from making the inquiries and examination which a prudent man ought to make." *Armentrout*, 258 S.E.2d at 524 (citation omitted).

For these reasons, the court will not dismiss the Walkers' fraud in the inducement claim against Sanchez.

### 2. Constructive Fraud (Count 2).

Sanchez also moves to dismiss the Walkers' constructive fraud claim. (Dkt. 8 at 7–8.) "Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it." *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994).

Sanchez makes one argument to dismiss the Walkers' constructive fraud claim: that it is barred by the economic loss rule. (Dkt. 8 at 7–8.) "The economic-loss rule is a 'remedy-

- 18 -

specific application of the source of duty rule' and prevents recovery in tort for 'damages

which were within the contemplation of the parties when framing their agreement.'" *Harrell*,

97 F.4th at 190 (quoting *Tingler*, 834 S.E.2d at 264). This rule prevents a party from recasting

a breach of contract as a tort claim and thereby recovering damages not available in contract.

Just as with the source-of-duty rule, "[t]he question whether the economic loss doctrine applies

requires a court first to determine whether a cause of action sounds in contract or tort,

ultimately by ascertaining the source of the duty violated." *Abi-Najm*, 699 S.E.2d at 489

(internal quotation marks omitted).

Here—just as with the source of duty analysis above—the Walkers' "constructive fraud

claims are for more than disappointed economic expectations sounding in contract." *Harold*

*v. TMC Enters., LLC*, No. 6:16-CV-00025, 2016 WL 6069023, at *6 (W.D. Va. Oct. 17, 2016).

The Walkers allege "that Defendants' constructive fraud induced" them to sign, perform, and

close on "a contract [they] would not have otherwise." *Id.*; (Compl. ¶¶ 66–67.) Thus,

"[a]lthough a contract is involved, this is a matter of tort law"—specifically, of fraud—and

"the economic loss rule does not apply." *Harold*, 2016 WL 6069023, at *6; *see also id.* ("The

purported misrepresentations occurred before the contract was signed, so any duty owed to

the Plaintiff could not have arisen out of contract law.").

Sanchez cites *White v. Potocska* for the proposition that "[t]here can be no action for

constructive fraud under the 'present intention' theory of fraud." (Dkt. 14 at 7–8 (quoting

589 F. Supp. 2d 631, 659 (E.D. Va. 2008).) But *White* was making a narrow point here, rather

than offering a categorical rule against applying the present intention theory to constructive

fraud claims. In *White*, the court had simply already decided that the claimants had shown "no

evidence to support the contention that [the counterclaim defendant] had a present intention" to fail to perform his promise. 589 F. Supp. 2d at 656. At the motion to dismiss stage, by contrast, this court must accept the Walkers' well-pleaded allegations of present fraudulent intent as true. And in any event, the Walkers' complaint doesn't rely solely on the "present intention" theory. The complaint also alleges affirmative misrepresentations of fact by Sanchez—not just future promises—that induced the Walkers to enter, perform, and close on the contract. (Compl. ¶ 64 (alleging that Sanchez falsely stated that he had no knowledge of any problems relating to his failure to obtain necessary building permits).) These allegations alone are sufficient for the Walkers' constructive fraud claim to survive.

Sanchez also cites a case that states "while the economic loss rule does not bar claims of actual fraud in the inducement, it bars claims for constructive fraud." *Kruglyak v. Home Depot U.S.A., Inc.*, 750 F. Supp. 3d 644, 659 (W.D. Va. 2024); (*see* Dkt. 8 at 7.) But that case does not apply here. In *Kruglyak*, the plaintiff alleged constructive fraud from a breach of "duty that arises solely under [a] contract." 750 F. Supp. 3d at 659. *Kruglyak*, in other words, did not discuss pre-contractual misrepresentations of the type that the Walkers allege here: ones that induced the Walkers to enter into, perform, and close on a contract they otherwise would not have signed, performed, or closed on.

Accordingly, the economic loss rule does not bar the Walkers' constructive fraud claim against Sanchez at this stage. Sanchez's motion to dismiss Count 2 will be denied.

3. <u>Virginia Consumer Protection Act Claim (Count 4).</u>

Sanchez argues that the Walkers' VCPA claim must fail for three reasons: (1) the sale of the Property does not constitute a "consumer transaction" under the act; (2) Sanchez does

not meet the statutory definition of a "supplier"; and (3) the VCPA does not apply to residential home sales involving the seller's private residence.  (Dkt. 8 at 8–9.)

But each of Sanchez's arguments fail at this stage.  First, the court cannot locate—and Sanchez does not cite—authority stating that a real property sale cannot constitute a "consumer transaction" or that Sanchez is not a "supplier."  The statute and caselaw suggest the opposite.  The VCPA defines "consumer transactions" as "[t]he advertisement, sale, lease, license, or offering for sale, lease, or license, of *goods* or services to be used primarily for personal, family, or household purposes."  Va. Code Ann. § 59.1-198 (emphasis added).  In turn, the statute has an expansive definition of "goods" as "all *real*, personal, or mixed *property*, tangible or intangible."  *Id.* (emphasis added).  And a supplier is defined as a "seller . . . that advertises, solicits, or engages in *consumer transactions*."  *Id.*  (emphasis added).  Indeed, a Virginia court found—on similar facts to the instant case—that "Plaintiffs sufficiently pled that the action involves a 'consumer transaction' and that Defendant was 'supplier' for all intents and purposes of the VCPA claim."  *Nazar v. Balderson*, No. CL19-1600, 2020 WL 8839569, at *2 (Va. Cir. Ct. Jan. 29, 2020).

Moreover, Sanchez argues that the Property does not fall into the VCPA's purview because it involves the sale of "the seller's private residence."  (Dkt. 8 at 9.)  But, as the Walkers note, this is essentially an affirmative defense by Sanchez.  "[T]he Supreme Court of Virginia has held more generally that a party relying upon a statutory exemption bears the burden of proving facts necessary for assertion of that exemption."  *McChrystal v. Fairfax Cnty. Bd. of Supervisors*, No. CH-2005-000014, 2005 WL 832242, at *3 (Va. Cir. Ct. Mar. 22, 2005) (citing *Virginia Emp. Comm'n v. A.I.M. Corp.*, 302 S.E.2d 534, 539 (Va. 1983)).  An affirmative defense

- 21 -

may be reached at the Rule 12(b)(6) stage only "if all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (cleaned up). Because the Walkers' complaint did not allege that the Property was Sanchez's private residence, the court may not rule on Sanchez's defense at this time.

For the foregoing reasons, Sanchez's motion to dismiss Count 4 will be denied.

### B. Cersley & New Millennium

Cersley and New Millennium offer several arguments in support of their motion to dismiss. The court addresses each in turn.

1. <u>Whether New Millennium is an appropriate party to this action.</u>

As a threshold matter, Cersley and New Millennium assert that New Millennium is not an appropriate party to this action, as "[t]here are no factual allegations asserted against NMRE"—only Cersley. (Dkt. 17 at 3.) But the Walkers bring claims against New Millennium under a theory of vicarious liability. (Dkt. 24 at 6–7.) Under this theory, "a principal is liable for the fraudulent and deceitful acts of his agent 'committed as an incident to and during the performance of an act which is within the scope of the agent's authority.'" *Dudley v. Estate Life Ins. Co. of Am.*, 257 S.E.2d 871, 875 (Va. 1979) (quoting *Jefferson Standard Life Ins. Co. v. Hedrick*, 27 S.E.2d 198, 202 (Va. 1943)). The Walkers allege that Cersley's license was affiliated with New Millennium, that New Millennium shared commissions with Cersley, and that New Millennium had the power to dismiss her and dictate the means and method of her work. (Compl. ¶ 15.) These allegations are sufficient, at this stage, to retain New Millennium as a party as the principal of Cersley.

2.  Fraud in the Inducement (Count 13)

Cersley and New Millennium argue that the Walkers' fraud in the inducement claim should be dismissed for one main reason: they only had a duty to disclose "known material defects" to the Walkers.[3]  (Dkt. 17 at 4–5.)  But this is not the standard.  As previously discussed in the context of *caveat emptor* above, individuals have a duty to disclose concealed material facts "(1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations." *Norton v. Wilkins & Co. Realty*, No. 4:21-CV-00039, 2022 WL 3050673, at *10 (W.D. Va. Aug. 2, 2022) (quoting *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999)).

Still, even under this standard, the Walkers' allegations against Cersley and New Millennium do not state a claim for fraud in the inducement.  For all the facts that Cersley allegedly concealed from the Walkers—including, for example, the fact that she was in talks to join Yesford's brokerage while the transaction was pending—the Walkers do not allege that Cersley *knew* that "the [Walkers were] acting upon the assumption that th[ose] fact[s] do[] not exist." *Bank of Montreal*, 193 F.3d at 827.  Nor does the complaint allege steps Cersley took to "divert the other party from making prudent investigations." *Id.*

---

[3] The Walkers allege that Cersley and New Millennium made the following misrepresentations or concealments, inducing them to enter the residential sales contract.  The Walkers allege that Cersley and New Millennium (1) concealed that Cersley was in talks to join E Venture; (2) concealed that Yesford was a "Partner" with TWJ Enterprises LLC, a contractor, owned by Cersley and her husband; (3) concealed that Sanchez was an unlicensed contractor; (4) concealed that Sanchez hired contractors and individuals who did not hold contractors' licenses in Virginia; (5) concealed that the renovation work was not permitted and inspected; (6) concealed that Sanchez, an unlicensed contractor, would be performing the HICRA repairs; (7) concealed that Sanchez would not obtain receipts for the HICRA repairs; (8) concealed the fact that a water potability test had not been performed; and (9) misrepresented that septic and well repairs were scheduled when they were not.  (Compl. ¶ 143.)

The bulk of the Walkers' claims against Cersley were based on concealment. (*See* Compl. ¶ 143.) The Walkers make only one non-concealment allegation against Cersley: that she "misrepresented that septic and well repairs were scheduled when they were not." (*Id.*) But this allegation is conclusory, and as far as the court can discern, the Walkers allege that only Yesford—and not Cersley—made such a misrepresentation. (*See id.* ¶ 44 ("Despite Yesford's assurances that the repairs would be done in two weeks, upon information and belief, the repairs had not yet been scheduled.").) The Walkers do not allege that Cersley communicated with them at all regarding the septic repairs.

Because the operative allegations against Cersley are for concealment—and because the Walkers do not adequately allege that Cersley had a duty to reveal such concealed facts— the court will dismiss the Walkers' fraud in the inducement claims against Cersley and New Millennium.

### 3. Constructive Fraud (Count 14)

Cersley and New Millennium argue that the Walkers' constructive fraud claims must also be dismissed. (Dkt. 17 at 5–6.) Their argument—that Cersley had no independent duty to speak accurately to the Walkers—mirrors their fraud in the inducement argument. (*Id.*)

It is true that, as the court has just held, Cersley did not have a duty to disclose material facts to the Walkers (at least, as the complaint is currently pleaded). But the Walkers' constructive fraud claim against Cersley and New Millennium fails for a more fundamental reason. "[U]nlike fraud for affirmative misrepresentations, concealment requires a showing of *intent* to conceal a material fact; reckless nondisclosure is not actionable." *Bank of Montreal,* 193 F.3d at 827 (emphasis added). But as previously discussed, "[c]onstructive fraud" involves

false statements that are "made *innocently* or *negligently*." *Evaluation Research Corp.*, 439 S.E.2d at 390 (emphasis added). For this reason, Virginia courts have found that "[c]oncealment, in general, can only give rise to a claim of actual fraud," rather than constructive fraud. *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581 n.2 (Va. 2003). In other words, actionable concealment—which can only be committed intentionally—can never be committed negligently or innocently.

As discussed above, the Walkers' operative claims against Cersley consist solely of intentional concealment allegations. For this reason, the court will dismiss the Walkers' constructive fraud claim against Cersley and New Millennium.

### C. Yesford & E Venture[4]

Yesford and E Venture offer several arguments in support of their motion to dismiss. The court addresses each in turn.

1. <u>Piercing the Corporate Veil</u>

First, E Venture argues that because it is a separate legal entity from Yesford, the Walkers cannot "pierce the corporate veil" of E Venture. (Dkt. 21-1 at 2–3.) But the Walkers are not proceeding under a veil-piercing theory. Rather, they seek to hold E Venture vicariously liable for the tortious acts of its agent, Yesford. (Compl. ¶ 18 ("E Venture . . . had the power to dismiss [Yesford], and the power to dictate the means and method of her work."); *Dudley*, 257 S.E.2d at 875 ("[A] principal is liable for the fraudulent and deceitful acts of his agent 'committed as an incident to and during the performance of an act which is within the

---

[4] Yesford and E Venture filed separate motions to dismiss. (Dkts. 10, 11, 20, 22.) However, the parties—represented by the same counsel—filed practically identical memoranda in support of their motions to dismiss. (Dkts. 11-1, 21-1.) For this reason, the court will refer to Yesford and E Venture together throughout this memorandum opinion.

scope of the agent's authority.'" (cleaned up)).  For this reason, veil-piercing has no bearing on this suit.

### 2.  Fraud in the Inducement (Count 10)

Yesford and E Venture make several arguments in favor of dismissing the Walkers' fraud in the inducement claim.  Their arguments fail.

> *i.    The Walkers may allege fraud in the inducement for contract performance, not merely formation.*

First, Yesford and E Venture argue that thirteen of the Walkers' fifteen allegations[5] cannot support a claim for fraud in the inducement, as "[o]nly two of the fifteen express allegations . . . predate the Plaintiffs' alleged contract with Defendant."  (Dkt. 11-1 at 4; Dkt. 21-1 at 3–4.)  As Yesford and E Venture argue, these post-contract allegations cannot "survive because post contractual actions cannot logically induce someone into entering a contract."  (Dkt. 21-1 at 4; *see* Dkt. 11-1 at 4.)

But "*[p]erformance* of an executory contract"—and not just the *formation* of contracts "may be fraudulently induced."  *Ware v. Scott*, 257 S.E.2d 855, 857 (Va. 1979) (emphasis added).  The Walkers entered into a voidable contract, where they could have backed out of their

---

[5] According to the Walkers, "Yesford and E Venture made the following false representations of material fact and/or fraudulently concealed the following material facts": Yesford and E Venture (1) concealed that Yesford and E Venture were in negotiations for Cersley to join E Venture; (2) concealed that Yesford and/or E Venture was a "Partner" with a contractor owned by Cersley or her husband; (3) misrepresented that Moore had an active home inspection license in Virginia; (4) misrepresented that the home inspection was "Overall good some minor things"; (5) concealed Moore's opinion that the "sistered" columns on the deck are indicative of structural weakness; (6) concealed Moore's opinion that the Walkers should hire a contractor to inspect the deck and the Property's structure; (7) concealed the fact "that Sanchez was a contractor"; (8) concealed that Sanchez was the "contractor" who was to make the repairs listed in the HICRA; (9) misrepresented that Sanchez agreed to conduct the repairs in the HICRA when he had not; (10) concealed that the deadline to negotiate the HICRA repairs had expired; (11) concealed that the deadline to void the Contract pursuant to the Home Inspection Addendum was near its expiration; (12) concealed "the fact that an addendum was necessary to protect the Walkers' interests under the Home Inspection Addendum"; (13) concealed "the fact that an addendum was necessary to protect the Walkers' interests under the Septic Addendum"; (14) concealed "the fact that a water potability test had not been performed"; and (15) concealed "the fact that septic and well repairs were not scheduled when the Walkers signed the Addendum – Sale and Occupancy Agreement."  (Compl. ¶ 124.)

purchase of the Property at multiple points.  The Walkers allege that Yesford and E Venture

fraudulently induced them to "perform" the contracts at multiple stages when they could have

otherwise voided the contract.  (Compl. ¶¶ 125, 131.)  "When the breach of that duty induces

the vendee to perform a *voidable* covenant to purchase, the breach constitutes fraudulent

inducement to perform . . . ."  *Ware*, 257 S.E.2d at 858 (emphasis added).

For this reason, even after the residential sales contract was *formed*, the Walkers may

allege that they *performed* the contract based on fraudulent misrepresentations by Yesford and

E Venture.

> ii. *The Walkers' pre-contract fraud claims adequately state damages and allege fraud with adequate specificity.*

Next, Yesford and E Venture argue that the Walkers' two pre-contract fraud

allegations—that Yesford failed to disclose employment negotiations with Cersley and failed

to disclose that "Yesford and/or E Venture LLC" was a "Partner" with TWJ Enterprises

LLC—fail to state damages and are insufficiently specific. (Dkt. 11-1 at 4–5; Dkt. 21-1 at 4–

5.)    As to damages, the Walkers adequately alleged that they "would have either used a

different selling agent and broker or decided not to look at the Property."  (Compl. ¶ 20.)

They also allege monetary losses, including the purchase price paid, lost value of the property,

costs to repair the property, and loss of rental income.  (*Id.* ¶ 128.)    These allegations are

sufficient to plead damages at the motion to dismiss stage.

As to specificity, the court's Rule 9(b) analysis set forth above applies with equal force

here.  The Walkers' allegations reveal details regarding "the time, place, and contents of the

false representations, as well as the identity of the person making the misrepresentation and

what he obtained thereby." *Edmonson*, 922 F.3d at 553 (citation omitted). The court finds these allegations to be sufficient at the motion to dismiss stage.

> iii.    *Yesford and E Venture had a duty to disclose certain concealed facts.*

Next, Yesford and E Venture argue that "the Complaint does not specify why Defendant has a duty to disclose or represent anything to Plaintiffs," nor do the Walkers "articulate any such duty or explain why such duty exists." (Dkt. 11-1 at 5; Dkt. 21-1 at 5.) They also argue that concealment does not rise to the level of "misrepresentation of an existing or pre-existing fact." (Dkt. 11-1 at 5; Dkt. 21-1 at 4.)

However, as explained above, Yesford would have a duty to disclose concealed facts if she knew "the [Walkers were] acting on the assumption that no such fact exists" or "t[ook] actions which divert the other party from making prudent investigations." *Bank of Montreal*, 193 F.3d at 827, 829 (cleaned up). Here, the Walkers' allegations sufficiently state that Yesford had such a duty. Most significantly, the Walkers told Yesford that they would "never consider purchasing a home with a foundation or structural issue," (Compl. ¶ 22), after which Yesford allegedly concealed Moore's recommendation "that the Walkers hire a contractor to . . . perform a structural inspection" of the deck, (*id.* ¶ 27). Yesford's comment characterizing the inspection results as "[o]verall good some minor things," (*id.*), also arguably "diverted" the Walkers from inspecting this potential defect further, *Armentrout*, 258 S.E.2d at 524. This alone is sufficient for the Walkers' fraud in the inducement claim against Yesford to survive.

Yesford argues that her "[o]verall good some minor things" comment was just a "mere expression of an opinion," which "however strong and positive the language may be, is no

- 28 -

fraud." (Dkt. 11-1 at 6; Dkt. 21-1 at 6 (quoting *Mortarino v. Consultant Eng'g Servs., Inc.*, 467 S.E.2d 778, 781 (Va. 1996).) But Yesford's statement was a "representation[] of the present quality or character of the property and, thus . . . not [a] mere expression[] of opinion." *Tate v. Colony House Builders, Inc.*, 508 S.E.2d 597, 600 (Va. 1999). Thus, Yesford's statement could "rightfully be relied upon." *Id.*

For these reasons, the court finds that the Walkers have adequately stated a claim for fraud in the inducement against Yesford and E Venture.

### 3. Constructive Fraud (Count 11)

Yesford's and E Venture's arguments against the Walkers' constructive fraud claims largely "appl[y] and restate[]" their fraud in the inducement arguments, (Dkt. 11-1 at 6; Dkt. 21-1 at 6), which have already been rejected above. But Yesford and E Venture further argue that the Walkers "should not have expected or relied on Defendant to make any representations about the condition of the Property." (Dkt. 11-1 at 6; Dkt. 21-1 at 6.) But, as discussed above, because Yesford's alleged misrepresentation about Moore's inspection results was a "representation[] of the present quality or character of the property," this representation could "rightfully be relied upon." *Tate*, 508 S.E.2d at 600. Even if this statement was made negligently or innocently, Yesford may be liable under constructive fraud if it induced the Walkers to contract with Yesford and Sanchez.

At this stage, then, the court will decline to dismiss the constructive fraud claim against Yesford and E Venture.

4.    Breach of Contract (Count 12)

Finally, Yesford and E Venture argue that the Walkers' breach of contract claim should be dismissed for two reasons.  The court addresses each in turn.

i.    *The statute of frauds is not a basis for dismissal at the 12(b)(6) stage.*

First, Yesford and E Venture argue that the claim is barred by the statute of frauds. (Dkt. 11-1 at 7; Dkt. 21-1 at 7.)  But the applicability of the statute of frauds is an affirmative defense that generally cannot be decided on a 12(b)(6) motion to dismiss.  A defense may be reached at the 12(b)(6) stage only "if all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint."  *Goodman*, 494 F.3d at 464 (emphasis omitted).

The court does not have enough facts to determine that the statute of frauds applies here.  To the contrary, the Walkers' pleadings indicate that the statute of frauds does *not* pose a problem.  The Walkers attached the residential sale contract as an exhibit to their complaint, (*see* Dkt. 1-2), and such contracts have been held to be "sufficient written evidence of an oral agreement" to satisfy the statute of frauds.  *C. Porter Vaughan, Inc. v. DiLorenzo*, 689 S.E.2d 656, 660 (Va. 2010); *see also Drake v. Livesay*, 341 S.E.2d 186, 188 (Va. 1986) (noting that the statute of frauds poses no problem when a party adduces "proof of a sufficient written memorandum of the transaction").

For this reason, the court declines to rule at the 12(b)(6) stage that the statute of frauds bars the enforcement of an oral contract that may exist between Yesford and the Walkers.

*ii.      The Walkers have not alleged the existence of an oral contract.*

Second, Yesford and E Venture argue that the complaint "does not assert the terms of the alleged contract" and makes only conclusory allegations that the oral contract was breached.  (Dkt. 11-1 at 7–8; Dkt. 21-1 at 7–8.)

"Oral contracts are enforceable in Virginia, provided that the proponent of the oral contract can establish all the elements of an enforceable contract—offer, acceptance, and consideration."  *Waller v. Hugh Johnson Enters., Inc.*, No. 4:22-cv-00120, 2024 WL 3417999, at *3 (W.D. Va. July 15, 2024).  But in alleging the existence of an oral contract, the Walkers state only that "[o]n May 29, 2023, the Walkers entered into an oral brokerage agreement with Yesford and E Venture whereby Yesford and E Venture would act on the Walkers' behalf and represent the Walkers in their efforts to purchase the Property."  (Compl. ¶ 137.)  This conclusory language does not clearly allege "mutual assent . . . to *terms reasonably certain.*"  *Allen v. Aetna Casualty & Surety Co.*, 281 S.E.2d 818, 820 (Va. 1981) (emphasis added).  And perhaps more importantly, the Walkers do not allege any consideration was exchanged by the parties. Without more, the Walkers do not allege the existence of a contract—and thus cannot state a claim for breach of contract.

For these reasons, Yesford's and E Venture's motions to dismiss will be granted as to Count 12.

### D.  Civil Conspiracy (Count 15)

The Walkers argue that each defendant conspired with one another to fraudulently induce the Walkers to enter into and perform various contracts.  (Compl. ¶¶ 155–61.)  All Defendants argue that the Walkers insufficiently pleaded their civil conspiracy count.  (Dkt. 8

at 9; Dkt. 11-1 at 8; Dkt. 17 at 6–7; Dkt. 21-1 at 8.)  The Walkers respond that their complaint adequately alleges "a unity of design and purpose . . . from which the Court can draw reasonable inferences that the parties agreed to accomplish a common unlawful purpose." (Dkt. 13 at 27; Dkt. 24 at 15; Dkt. 25 at 27; *see* Dkt. 12 at 21.)

To state a claim for conspiracy, "the factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement." *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011); *Dogs Deserve Better, Inc. v. Terry*, No. 3:14-cv-00591, 2015 WL 1288324, at *4 (E.D. Va. Mar. 20, 2015).  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *A Society Without A Name*, 655 F.3d at 346 (quoting *Twombly*, 550 U.S. at 556–57).  For example, in *A Society Without A Name*, "the complaint allege[d] nothing more specific than statements that [certain parties] entered into a conspiracy" and "that they had a meeting of the minds that they would act in concert" to accomplish an unlawful goal.  655 F.3d at 347 (cleaned up).

The Walkers use the same conclusory language in their complaint.  The Walkers allege that the Defendants "agreed to and did conspire to willfully participate in inducing the Walkers" to enter the contracts at issue in this case.  (Compl. ¶¶ 157–159.)  But "[w]ithout any allegation as to 'specific communications' between the alleged conspirators or 'the manner in which any such communications were made,'" the Walkers' "complaint fails to plead an essential element of conspiracy." *Kitchen & Bath Shop, LLC v. Kitchen & Bath Shop, LLC*, No. 2:22-CV-184, 2023 WL 6192722, at *7 (E.D. Va. June 21, 2023) (quoting *A Society Without a Name*, 655 F.3d at 347).  "Pleading that the alleged conspirators had a common purpose is not

- 32 -

enough to allow the Court to infer an agreement that would survive the motion to dismiss."

*Id.*

For these reasons, each Defendant's motion to dismiss will be granted as to the civil conspiracy claim.

## IV.    Conclusion

For the foregoing reasons, Sanchez's motion to dismiss, (Dkt. 7), will be granted in part and denied in part.  Cersley and New Millennium's motion to dismiss, (Dkt. 16), will be granted.  Yesford's motion to dismiss, (Dkts. 10, 11), will be granted in part and denied in part.  E Venture's motion to dismiss, (Dkts. 20, 21), will be granted in part and denied in part.

Counts 12, 13, 14, and 15 will be dismissed without prejudice.  Plaintiffs will be granted limited leave to amend Counts 12, 13, 14 and 15, and, if desired, to incorporate additional factual allegations supporting such Counts, within fourteen days of the court's order.  If Plaintiffs wish to add any additional counts, they must file a motion for leave to amend.  If Plaintiffs fail to file an amended complaint as directed within fourteen days of the court's order, Counts 12, 13, 14, and 15 will be dismissed with prejudice.

An appropriate Order will issue.

**ENTERED** this <u>26th</u> day of March, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

- 33 -